UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PATRICIA M. DENNY,

        Plaintiff,     5:08-CV-838

  v.

BUNN-O-MATIC CORPORATION,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:          OF COUNSEL:

MITCHELL, GORIS LAW FIRM     PATRICK J. O'SULLIVAN, ESQ.
Attorneys for Plaintiff
5 Mill Street
P.O. Box 312
Cazenovia, NY 13035

HISCOCK, BARCLAY LAW FIRM    ROBERT M. SHADDOCK, ESQ.
Attorneys for Defendant
2000 HSBC Plaza
100 Chestnut Street
Rochester, NY 14604-2072

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Patricia Denny ("plaintiff" or "Denny") brings this action against the defendant seeking compensation for damages she sustained when her Baldwinsville, New York, home was destroyed by fire on January 26, 2006. Plaintiff asserts that a coffee maker that was manufactured by defendant was defective, unreasonably dangerous, and caused the fire. The complaint was initially filed in the Supreme Court, Onondaga County,

on June 23, 2008. On August 1, 2008, defendant removed the action to the district court pursuant to 28 U.S.C. § 1441. The court has jurisdiction under 28 U.S.C. § 1332.

The discovery process has ended, and defendant has moved for the following: (1) an order precluding the testimony of plaintiff's experts under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993); (2) spoliation sanctions for plaintiff's failure to preserve evidence; and (3) summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the complaint in its entirety. Plaintiff opposes. Oral argument regarding the instant motion was held on February 11, 2011, in Utica, New York.

## II. **FACTUAL BACKGROUND**

Plaintiff purchased the coffee maker at issue in late 2004 or early 2005. It is undisputed that the model coffee maker at issue was subject to two product recalls. The first recall was announced on June 10, 2005, and warned that the coffee maker posed a fire hazard. The second recall, dated July 25, 2006, expanded the first recall to include later-manufactured coffee makers of this particular model. It is believed that these recalls were prompted by 33 fires in which this model coffee maker was implicated.

On the morning of January 26, 2006, plaintiff, who lived alone, made coffee per her routine and left for work. At approximately 3:00p.m. that afternoon Denny was notified that there had been a fire at her house. It appears undisputed that the fire originated in the kitchen, in the area where the coffee maker sat on a counter. Denny maintains that the coffee maker was plugged directly into a wall outlet near the counter and was the only appliance plugged into that outlet.

Ronald Ryan, Onondaga County fire investigator, arrived at the fire scene approximately 45 minutes after the fire was reported. During his investigation he placed the remains of the coffee maker as well as the wall outlet and associated wiring in a plastic evidence bag. Ryan left this bag on the counter in the fire-damaged kitchen. Ryan denies disassembling or altering the coffee maker. Ryan noted that the home had "knob and tube" wiring that, although common in older construction, does not meet current electrical codes. Ryan concluded that the fire started in the area where the coffee maker was plugged into the wall outlet, but he was unable to definitively determine whether the coffee maker or the outlet and its wiring caused the fire.

The next day, January 27, 2006, Carl Dengel, a claim representative for State Farm Insurance Company ("State Farm"), plaintiff's insurance provider, responded to the scene and took possession of the plastic bag of evidence that had been left on the counter. Dengel locked the bag in the trunk of his car and then boarded-up the windows and doors of the house to preserve the scene.

Also on January 27, 2006, Gordon Ivory, a cause and origin investigator, was retained by State Farm to investigate the fire. On that date, Dengel gave Ivory the plastic bag containing the coffee maker, outlet, and wiring. Ivory claims that when he received the bag it was "semi-sealed"—meaning it was "rolled up" with evidence tape on the outside of the bag but not covering the opening. Ivory placed this bag in a storage facility at his lab. Ivory performed a physical inspection of the fire scene on January 28, 2006, removed a wall switch and its wiring from the kitchen, and utilized a hydrocarbon detector. Ivory denies altering the physical evidence in any way and transferred the evidence to James

- 3 -

Hahn on February 3, 2006. Ivory concluded that the fire was caused by the subject coffee maker.

James Hahn, a forensic electrical engineer retained by State Farm, conducted an examination of the physical evidence over the course of several days in February 2006, during which he used a temperature meter. Hahn denies "disassembling" the coffee maker but acknowledges "pulling back" the covers of two internal wires. Hahn claims that these internal wires were disconnected from the coffee maker when he received the evidence. Hahn released an initial report on June 5, 2006, which concluded that the coffee maker's internal wires had arced at points referred to as "3X" and "5X" and caused the ignition of the fire. On April 19, 2010, after conducting additional tests and receiving new information, Hahn provided a supplemental report indicating that an arc at point "2X" could also have ignited the fire.

On April 24, 2006, John Edie, Vice President of quality assurance for defendant, and Nathan Dwyer, an investigator retained by defendant, examined the scene and the physical evidence. Both concluded that the coffee maker was not defective, did not exhibit a failure similar to the reason for the product recalls, and did not cause this fire.

## III. DISCUSSION

Defendant argues that plaintiff's claim should be dismissed because: (1) plaintiff cannot establish that the coffee maker was defective or caused the fire; (2) plaintiff's representatives altered the physical evidence and failed to preserve the scene; and (3) plaintiff's experts are unreliable and their testimony should be precluded.[1] Since plaintiff's

---

[1] Defendant does not question either expert's credentials.

ability to establish a prima facie case hinges on the admissibility of the expert testimony, the first and third issues are analyzed together.

### A. Summary Judgment Standard

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250, 106 S. Ct. at 2511; Fed. R. Civ. P. 56(e).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the

record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Expert Testimony and Prima Facie Case

It is well-established that "[u]nder Daubert, the district court functions as the gatekeeper for expert testimony whether proffered at trial or in connection with a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks and citation omitted). Such testimony must be reliable and is properly excluded if it is "speculative or conjectural." Id.

### 1. Gordon Ivory

Defendant claims that Ivory's findings are unreliable because he failed to consider the wall outlet as a possible source of the fire and did not properly calibrate his hydrocarbon detector.

Ivory explained that he had not calibrated the detector in the six months prior to the Denny fire investigation because he "readily change[s] the tip" and cleans it after every use. It is unclear whether this guarantees the accuracy of the detector. Regardless, it appears that this device is used to detect signs of accelerants to indicate that a fire was intentionally set. Defendant itself does not allege that this fire was intentionally set and there is no evidence to suggest otherwise. Defendant's own representatives and experts agree that the point of origin was in the area of the kitchen where the coffee maker was plugged into the wall. Also, Ivory did not rely on the detector's readings alone. He noted

that his visual inspection of the premises revealed "no signs of pour patterns, trailers, or intentional sets."

Ivory's report shows that he considered alternative sources of the fire. He examined and ruled out as a possible cause the dishwasher, refrigerator, toaster, stove, range hood, microwave, and a small television—all of which were located in the kitchen. Ivory also removed a light switch as well as the wires "directly above and below the wall outlet that the coffee maker was plugged into" and provided same to Hahn for analysis. In reaching his conclusion that the coffee maker caused the fire, Ivory relied, in part, on the numerous signs of arcing inside the coffee maker that Hahn's analysis revealed.

It cannot be said that Ivory's findings are unreliable or that he ignored alternative sources of the fire. Accordingly, his expert testimony will be permitted.

**2. James Hahn**

Defendant claims that Hahn's findings are unreliable because they are based on an incorrect assumption that one of the internal wires was rated at only 90°C, he subsequently changed his opinion, he failed to test his theories, he did not properly calibrate his temperature meter, and he ignored the possibility that the wall outlet caused the fire.

First, to reach his conclusion that the operating temperature exceeded the temperature rating of the "neutral wire" inside the coffee maker, Hahn assumed that this wire was not rated higher than 90°C. However, this was a reasonable assumption since a neighboring wire was labeled with a 200°C rating and the neutral wire was unlabeled. Hahn testified that the National Electric Code allows wires to be unlabeled only if their temperature rating is less than 90°C (194°F). When Hahn tested an exemplar coffee

maker, he found that the temperature reached 210°F—16°F higher than what an unlabeled wire could handle. Hahn concluded that this was "the most likely explanation for the short" that started the fire.

Defendant's expert, Nathan Dwyer, testified that the neutral wire was actually rated at 200°C and, therefore, could withstand the highest temperature measured by Hahn's test. Dwyer claimed that he was "not aware" of the requirement that a wire be stamped with a 200°C rating. Defendant also submits purchase orders from January 2005 showing that 200°C-rated wire was purchased and used in the model coffee maker at issue. Denny maintains that these purchase orders are irrelevant as they do not establish that this specific coffee maker, which may have been purchased as early as 2004, contained 200°C-rated wire.

Considering these opposing arguments, and viewing the facts in the light most favorable to plaintiff, it cannot be said that Hahn's assumption that the internal wire was rated at 90°C was "so unrealistic and contradictory as to suggest bad faith." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks omitted). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Id.

Second, defendant's attempt to discredit Hahn because he supplemented his report is not persuasive. Hahn's initial report indicated that he found five different arcs in the wiring inside the coffee maker and identified the 3X and 5X arcs as the "most probable" source of ignition. The initial report also "suggested" that the other three arcs were the result of the fire, not the cause. In his supplemental report, Hahn identified new evidence and concluded that the 2X arc could have been the source of ignition. Hahn also

noted that his "opinion stated in the June 5, 2006 report, that 'an internal electrical short in the Bunn Model GR10 coffee maker was the source of ignition of this fire' remains unchanged." Therefore, his supplemental report was consistent with the initial report and does not call into question the reliability of his testimony.

Third, Hahn performed tests on exemplar coffee makers. His report indicates that he attached a temperature meter to the coffee maker's tank at the location of the 3X and 5X arcs, filled the tank with water, and found that the tank reached 210.8°F after 48 minutes. Moreover, the case cited by defendant for the proposition that expert testimony should be excluded if the expert fails to sufficiently test all theories, Brooks v. Outboard Marine Corp., 234 F.3d 89 (2d Cir. 2000), can be distinguished here for the same reason at least two other district courts have distinguished it. See Tedone v. H.J. Heinz Co., 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009); Bah v. Nordson Corp., No. Civ. 9060, 2005 WL 1813023, at *8 (S.D.N.Y. Aug. 1, 2005). In Brooks, the expert testimony was excluded because the expert did not have experience with the kind of boat and engine at issue, never saw the actual evidence, did not speak with witnesses, was unaware of the basic facts of the incident, and did not reconstruct the accident. Here, Hahn, who has been a forensic electrical engineer for 17 years, has an abundance of experience investigating and analyzing failures in electrical appliances that cause fires and property damage. Further, Hahn examined the actual coffee maker and wiring in question, inspected the fire scene, spoke with witnesses and investigators, and was familiar with the facts.

Fourth, regarding the temperature meter, Hahn testified at his deposition that "the meter was calibrated at the time of the test." Therefore, defendant's claim that Hahn did not calibrate the meter is without merit.

Finally, Hahn's initial and supplemental reports show that he inspected the wall outlet but ruled it out as a cause of the fire because the damage was attributed to melting from the fire and not to "any abnormal electrical activity on the wiring or contacts." Hahn also noted that the junction box and switch that Ivory had removed "showed no evidence of abnormal electrical activity nor did any of the house wiring retrieved from the scene." Therefore, Hahn did consider alternative sources of the fire.

In sum, Ivory's and Hahn's expert analyses and conclusions are relevant, reliable, and would help a jury understand the cause of this fire. Defendant's criticisms go towards the weight of this evidence, not its admissibility. Defendant can subject the experts to cross-examination and present its own expert testimony at trial. Therefore, the plaintiff's expert testimony will be permitted. It follows that plaintiff's claim survives a motion for summary judgment as these experts establish a causal link between defendant's product and the fire in plaintiff's home.

### C. Spoliation of Evidence

Defendant seeks dismissal of this action as a sanction for plaintiff's spoliation of evidence. Specifically, defendant alleges that plaintiff's representatives failed to preserve the fire scene and altered the physical evidence. In order to succeed on a spoliation claim, defendant must establish that: (1) plaintiff was under an obligation to preserve the evidence; (2) the evidence was destroyed with a culpable state of mind; and (3) the evidence destroyed was relevant to the plaintiff's claim or defense. Byrnie v. Town of Cromwell, 243 F.3d 93, 109 (2d Cir. 2001).

### 1. Physical Evidence

Critical to a party's obligation to preserve evidence is knowing when that obligation attaches. On the afternoon of the fire, Investigator Ryan placed the coffee maker, wall outlet, and wiring in an evidence bag and left it on the counter in the kitchen. However, it was not until the following day that State Farm representative Dengel secured the bag in the trunk of his vehicle. There is no evidence that Denny or her insurance carrier anticipated litigation at the time the bag of evidence was left on the counter overnight. The earliest time that litigation became a possibility was on January 27, 2006, when Dengel examined the premises. From that point forward there is a clear chain-of-custody regarding the evidence.

It cannot be argued that the evidence was "destroyed." While Hahn stated that the internal wires were separated from the coffee maker when he received it, everyone who previously handled this evidence testified that they did not disassemble or alter it in any way. Hahn also denied disassembling the coffee maker and claimed to have only "pulled back" the covering of the internal wires. His alteration is well documented and photographed. Moreover, the condition of the evidence did not prevent defendant's experts from concluding that the coffee maker was not defective and did not cause this fire.

### 2. The Fire Scene

As noted above, the obligation to preserve evidence did not attach until State Farm representative Dengel surveyed the scene on January 27, 2006. At that time, Dengel retained the services of CNY Fire Emergency Services, Inc. to seal off the scene by boarding-up the windows and doors. Ivory, who inspected the scene on January 28, 2006,

testified that the windows were boarded-up when he arrived. Ivory photographed the kitchen before he moved any debris, documented any alterations he made or items he removed, and did not allow anyone else in the kitchen while he was there. He also claims that when he left, the house was secured in the same manner in which he had found it and he instructed Denny not to re-enter the home. There is no evidence that anyone entered the house again until the joint inspection with defendant's representatives on April 24, 2006. Additionally, plaintiff's counsel noted at oral argument that there are over 100 photographs of the scene that have been made available to defendant.

Defendant also complains that its representatives did not examine the fire scene until almost three months after the fire. However, they had been notified within 60 days of the fire. Dengel claims that after Ivory informed him that a Bunn coffee maker caused the fire, he sent defendant a letter, dated March 24, 2006, notifying defendant of its potential liability. Defendant apparently waited another month before scheduling an inspection.

In sum, there is insufficient evidence to support defendant's claim that plaintiff's representatives failed to carry out their obligation to preserve the physical evidence. Accordingly, defendant's request for spoliation sanctions—especially such a drastic sanction as dismissal of the entire claim—will be denied. Defendant can highlight any alleged mishandling of the scene and evidence in front of the jury at trial.

## IV. **CONCLUSION**

Plaintiff's experts' analyses and conclusions are relevant, reliable, and would help a jury understand the cause of this fire. Therefore, the plaintiff's expert testimony will be permitted and, in turn, plaintiff can establish a causal link between defendant's product and the fire in her home. Further, there is insufficient evidence to support defendant's

assertion that plaintiff's representatives failed to adequately preserve the fire scene and altered the physical evidence.

As a result of the above, it is

ORDERED, that

1. Defendant's motion to preclude plaintiff's experts' testimony is DENIED;

2. Defendant's motion for summary judgment is DENIED; and

3. Defendant's motion for spoliation sanctions is DENIED.

The trial is scheduled to begin on May 16, 2011, in Utica, New York. Any pre-trial paperwork is to be filed on or before May 6, 2011.

IT IS SO ORDERED.

_____
United States District Judge

Dated: February 14, 2011
       Utica, New York.